IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Case No. |
| Complainant, | |
| v. | 1:22-cr-15 |
| KEN HARRELSON | |
| | Assigned to the Honorable |
| | Amit Mehta, District |
| *(Styled as <u>USA v. Rhodes et al.</u> incorporating cases against multiple Defendants)* | Court Judge |
| Defendant | |

**<u>MOTION FOR GOVERNMENT TO TURN OVER INVESTIGATIONS FILES AND OTHER INFORMATION AND TO PROVIDE ASSISTANCE NECESSARY TO IDENTIFY WITNESSES, REVIEW FILES FOR BRADY INFORMATION AND TO FACILITATE WITNESS ASSESSMENT, TRIAL PREPARATION AND SERVICE OF SUBPOENAS</u>**

Comes now Defendant, Kenneth Harrelson, through counsel, hereby requests that the Court order the United States to produce information in government files making it possible for the Defense to identify, assess suitability, and to serve *ad testificandum* subpoenas for trial purposes:

## I.      BRADY INFORMATION

The information demanded is exculpatory that the Government is required to produce

under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. This information will prove these

defendants to be innocent.  *Brady* requires prosecutors to disclose materially exculpatory

evidence in the government's possession to the defense. "*Brady* material" or evidence the

prosecutor is required to disclose under this rule includes any evidence favorable to the accused--

evidence that goes towards negating a defendant's guilt, that would reduce a defendant's potential

sentence, or evidence going to the credibility of a witness.

If the prosecution does not disclose material exculpatory evidence under this rule, and

prejudice ensues, the evidence shall be suppressed. The evidence shall be suppressed regardless

of whether the prosecutor knew the evidence was in his or her possession, or whether or not the

prosecutor intentionally or inadvertently withheld the evidence from the defense.

Further, in cases subsequent to *Brady*, the Supreme Court has eliminated the requirement

for a defendant to have requested favorable information, stating that the Prosecution has a

constitutional duty to disclose, that is triggered by the potential impact of favorable but

undisclosed evidence See *Kyles v. Whitley* 514 U.S. 419, 434 (1995) and *United States. v.*

*Bagley*, 473 U.S. 667 (1985).

The defendant bears the burden to prove that the undisclosed evidence was both material

and favorable which, as clearly set forth in Attachment 1, is undeniable.  In other words, the

defendant must prove that there is a "reasonable probability" that the outcome of the trial would

have been different, had the evidence been disclosed by the prosecutor. See *Kyles*, 514 U.S. at

433 (1995).  The *Bagley* and *Kyles* Court further defined the "materiality" standard, outlining the

four aspects of materiality.  First, the "reasonable probability" of a different result is not a

question of whether the defendant would more likely than not have received a different verdict

with the evidence, but whether the government's evidentiary suppression undermines the

confidence in the outcome of the trial.  The second aspect is that it is not a sufficiency of

evidence test, and the defendant only has to show that the favorable evidence could reasonably

be taken to put the whole case in such a different light as to undermine the confidence in the

verdict.  The third aspect is that there is no need for a harmless error review, because a *Brady*

violation, by definition, could not be treated as a harmless error.  Regarding the fourth and final

aspect of materiality the *Kyles* Court stressed was that the suppressed evidence must be

considered collective, not item by item, looking at the cumulative effect to determine whether a

reasonable probability is reached.  *See Kyles*, 514 U.S. at 433-438.

## I.    INFORMATION REQUESTED

New video evidence, as a practical matter only reviewable in the last eight (8) weeks,

suggests that individuals referenced in Attachment 1 were all material witnesses, some of whom

also were Suspicious Actor's (SA's), that witnessed or engaged in the following conduct,

including:

    a.  Attacking police and others.

    b.  Attacking Oath Keepers and others.

    c.  Entering Capitol doors in the West with apparent permission or acquiescence of government actors.

    d.  Opening the Columbus Doors in the East from the inside, possibly with even further assistance of government actors.

    e.  Deploying sophisticated crowd behavior techniques, orienting themselves at

3

demarcation lines between rally attendees and police and removing and concealing signs, barriers, and fencing, sometimes while being observed by Police, to deny others of consciousness of guilt.

f.  Sabotaging the day's activities by inflating participation into a "spectacle event" to where attendance levels outstripped physical space and effectiveness of understaffed US Capitol Police (USCP) and the Metropolitan Police Department compromising its response, confusing rally attendees and imposing on all concerned a dangerous public safety posture which resulted in injury and death.

g.  Associating, conferring and traveling with others engaging in behavior to confuse law enforcement through body masking, facial masking, clothing changes, and disorienting skirmishing behavior.

h.  Using ear-pieces and communications equipment to coordinate and confer, to divide labor and work together towards common objects. This cannot be dismissed, because the Government makes these same allegations against the Defendants and these very same attributes are used by the Government to try to show advance planning by these Defendants to achieve goals we now are learning they do not appear on video to be pursuing these goals while others are clearly depicted on video pursuing these goals. Therefore, the fact that it was others -- not these Defendants -- who exhibit these behaviors and coordinated use of this equipment cannot be merely brushed aside by the Government. Presumably, these phones were contained in geo-fencing collections obtained by the government. Often it appears that these communications devices do not seem to be affected by capacity restriction or sophisticated jamming that was evident throughout the day.

## II.    POSSIBLE ENTRAPMENT INFORMATION

If it can be established that these SA's were government agents, this could amount to

entrapment defense that will dispose of this 7th Indictment prior to trial.  If it can be established

that SA's, even without established government agency, [1]  from the West or elsewhere, were let

_____

[1] Recent disclosures that came to light in the recent Governor Whitmer trial suggest that the

Federal Bureau of Investigation continues to struggle with managing Confidential Human

Sources (CHS) since the 2019 Inspector General Report concluded that the FBI "Did Not

Comply with the AG Guidelines and Faces Ongoing Challenges in Overseeing Long-Term CHSs

and Current Validation Process Lacks Adequate Controls." https://oig.justice.gov/news/doj-oig-

releases-report-fbis-management-its-confidential-human-source-validation-processes.

High definition video released expeditiously by the Government in this case since

January from a Mutual Legal Assistance Treaty (MLAT) with France combined with

surveillance information that has become reviewable only within the last 8 weeks, raises

significant concerns of informants, influencers and inciters whose activities are now clearly

observable (210107 Laura Bangumi USA Capitol Washington video [under protective order]).

The now observable behavior suggests the exact kind of specialized training, coordination,

logistical support, timing and common goals and objectives that the Government attributes to the

Oath Keepers. Conduct alleged against the Oath Keepers seems to have been perpetrated by

others BEFORE THE OATH KEEPERS WERE BROUGHT IN FRONT OF THE COLUMBUS

DOORS.  Video review that has only just become available to the Defense not only exculpates

Defendant Harrelson and the Oath Keepers in compelling ways, it also shows a large group of

SA's that actually carry out the crimes of which the Oath Keepers are accused and which is the

into the Capitol and/or were assisted in opening the Columbus Doors from the inside—a reasonable inference from video evidence—a reasonable jury might conclude that one or more SA's had government sponsorship.  This combined with organized efforts we now see to remove and hide signage and barriers, create crowd momentum that may have hi-jacked charged defendants of their mental capacity to commit crimes, might prompt a petite jury to reasonably conclude that others are actually responsible for the crimes charged against these Defendants.

Prima facie evidence of an entrapment scheme (very possibly without formal government agency) is becoming impossible to ignore on video.  Suspicious Actor's (SAs) working towards common goals—demonstrably contained on a growing visual behavior record that sharply contrasts with observable behavior by the Oath Keepers—if it does suggest a common plan, it may suggest a common plan about which the Oath Keepers knew nothing about or deployed. Review of this video evidence strongly suggests that this common plan executed by now visible known and unknown persons—whether specifically directed at the Oath Keepers or not as an intended victim—seems to have had the effect of unduly influencing, framing and entrapping the centerpiece of the Government's case. Given the immense challenges the FBI and other agencies have to adequately track CHS, and given the gargantuan discovery obligations in this matter, government representatives assigned to this case could not know about this *Brady* information at this stage. Surprisingly, and among a host of challenges, there seems to have been no surveillance cameras outside the main entrance to the US Capitol.  This apparent Congressional oversight left a spotty record as to what actually occurred in front of the Columbus doors. But now this MLAT information shows a new cast of previously undiscovered subjects that can now be seen engaging in the actions that are to this day falsely attributed to the Oath Keepers enhancing the risks they pose to society and skewing the outcome of any trial.

Oath Keepers. In any event, the Oath Keepers may have had perfectly acceptable legal and independent reasons to enter restricted space.

## IV.    CONCLUSION

Attachment 1 is a first attempt to aggregate and identify these material witnesses, some of whom may be Suspicious Actors (SAs) who pursued motives, goals and plans that have been mistakenly imputed to the Oath Keepers or who even may have set out to frame the Oath Keepers. We go the extra step of setting forth a factual basis in Attachment 1 to establish clearly that this is undeniably *Brady* information.

Our assumption is that the Government's eventual rolling submission of 600+ investigative files on the eve of the scheduled July trial date may or may not overlap with Attachment 1, but even if this gave us the discovery the defense is entitled to, it would arrive too late.  The proof that supplemental requests like this one are timely is that the Government is very likely discovering this information from this filing and this speaks to the vast scope of the challenge an investigation like this poses to everyone on all sides and how difficult and time consuming visual information and crowd behavior is to review, analyze and interpret.  If the burden on this side of the table was large, the burden on the other side of the table was gargantuan.

Accordingly, we respectfully request that the Government assist the Defense in identifying the material witnesses and to turn over any and all Brady information about these material witnesses so that we can their suitability and serve *ad testificandum* subpoenas for trial purposes.

Dated:  May 5, 2022                                RESPECTFULLY SUBMITTED


                                                    /s/ Brad Geyer
                                                    Bradford L. Geyer, PHV
                                                    PA 62998
                                                    NJ 022751991
                                                    Suite 141 Route 130 S.
                                                    303
                                                    Cinnaminson, NJ 08077
                                                    Brad@FormerFedsGroup.Com
                                                    (856) 607-5708


## CERTIFICATE OF SERVICE


        I hereby certify that on May 5, 2022, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.


                                                    /s/ Brad Geyer
                                                    Bradford L. Geyer, PHV
                                                    PA 62998
                                                    NJ 022751991
                                                    Suite 141 Route 130 S., 303
                                                    Cinnaminson, NJ 08077
                                                    Brad@FormerFedsGroup.Com
                                                    (856) 607-5708

9